AO 91 (Rev. 11/11)  Criminal Complaint



# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff | |
| v. | Case No.   5:22-mj-00069 |
| RUBEN VALLE ALVARADO, | |
| Defendant. | |

**CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of February 2, 2022, in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), and (b)(1)(A)(viii) | Possession with intent to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

DEA Special Agent, Joseph Kelley
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed R. Crim. P. 4.1 by telephone.

Date: 2/3/2022

*Judge's signature*

City and state:  Riverside, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: Byron R. Tuyay (x6230)

## **AFFIDAVIT**

I, Joseph Kelley, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint against Ruben Valle ALVARADO ("ALVARADO") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (possession with intent to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine).

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration ("DEA") in Jurupa Valley, California, as described more fully in Attachment A:

   a. a silver iPhone ProMax 13 with service provider T-Mobile, with a translucent amber tinted case that has a white circular charging ring affixed to the back of it, ("SUBJECT DEVICE 1"); and

   b. a silver/white iPhone Model A1784 with a cracked screen, bearing FCC ID: BCG-E3092A, IC: 579C-E3092A, with service provider T-Mobile ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject

Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent with DEA and am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code.  I am empowered by law to conduct investigations and to make arrests for felony offenses as enumerated in 18 U.S.C. § 2516.  I have been employed with DEA since December 6, 2020, and am currently assigned to the Riverside District Office, Task Force Group 2.  I primarily investigate narcotics trafficking and distribution organizations operating in and around Riverside County.

6.  I have received 16 weeks of training at the DEA Academy in Quantico, Virginia, which included training in investigative techniques and procedures, legal instruction, firearms and tactical training, and defensive tactics.  I have attended advanced training in toll analysis, wire and electronic

2

intercepts, and electronic surveillance techniques and equipment. I have received additional training in financial investigations to include money laundering techniques and methods, and the use of cryptocurrency by Drug Trafficking Organizations ("DTOs").

7. Through the course of conducting narcotics investigations, I have gathered open-source intelligence, carried out physical and electronic surveillance, debriefed informants, executed search and arrest warrants, interviewed suspects on the methods of drug trafficking, and collaborated with different law enforcement agencies.

### III. SUMMARY OF PROBABLE CAUSE

8. In January 2022, a federal grand jury for the Western District of North Carolina returned an indictment and arrest warrant for Juan Octavio Iribe-Laveaga, for conspiracy to distribute and possess with intent to distribute methamphetamine, filed under case number 3:22-CR-16.

9. On February 1, 2022, United States Magistrate Judge Shashi H. Kewalramani authorized a search warrant for Iribe-Laveaga's residence, located at 7107 Vernazza Place, Eastvale, California 92880, filed under case number 5:22-MJ-00061.

10. On February 2, 2022, DEA investigators from the Charlotte District Office ("CDO") and Riverside District Office ("RDO"), in conjunction with the Riverside County Sheriff's Department Narc 2 Team ("RSO"), conducted an undercover operation to purchase methamphetamine from Iribe-Laveaga.

3

11. RDO investigators saw ALVARADO leave Iribe-Laveaga's residence at 7107 Vernazza Place in a silver Toyota Corolla and drive to The Home Depot parking lot at 6140 Hamner Avenue, Mira Loma, California 91752. While in the parking lot, an undercover agent ("UC") approached ALVARADO in the silver Toyota Corolla and sat in the front passenger seat. While in the Corolla together, the UC grabbed a black duffel bag from the back seat of the Corolla and placed it into his lap, opening it to confirm the presence of suspected methamphetamine. ALVARADO helped the UC open the duffel bag and they counted the individual bundles of suspected methamphetamine. The UC got out of the Corolla, ALVARADO was arrested, and the suspected methamphetamine was seized.

12. ALVARADO admitted to RSO investigators that he would be paid $600 to deliver the methamphetamine and stated that he did this work to provide for his family and would that he would not do so otherwise. ALVARADO also told RSO investigators that he had previously completed deliveries of methamphetamine.

13. The suspected methamphetamine packages recovered from the duffel bag in ALVARADO's Corolla field tested positive for methamphetamine.

14. The SUBJECT DEVICES were both found on ALVARADO's person.

## IV. STATEMENT OF PROBABLE CAUSE

15. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Background of Iribe-Laveaga Investigation

16. Based on the CDO investigation leading up to Iribe-Laveaga's arrest warrant and indictment in the Western District of North Carolina (3:22-CR-16) and the search warrant for his residence in the Central District of California (5:22-MJ-00061), CDO investigators identified Iribe-Laveaga as a DTO cell leader responsible for distributing drugs and collecting proceeds from drug sales. CDO investigators successfully infiltrated Iribe-Laveaga's cell using several UCs.

17. After several failed delivery attempts to ship methamphetamine through USPS to North Carolina, a CDO UC agent told Iribe-Laveaga that they could drive out to California to pick up 30 kilograms of methamphetamine.

### B. Meeting Between CDO UC Agent and Iribe-Laveaga

18. On February 1, 2022, CDO and RDO agents, along with RSO investigators, used two UCs to meet with Iribe-Laveaga at the Zendeja's Mexican Grill at 2440 South Vineyard Avenue, Ontario, California 91761. According to UCs, during the meeting, Iribe-Laveaga asked the UCsabout using money laundering services offered by the UCs.

19. On February 1, 2022, before the UCsmet with Iribe-Laveaga, RDO investigators conducting surveillance saw an unknown Hispanic male, later identified as ALVARADO, arrive at Iribe-Laveaga's residence in a silver Toyota Corolla bearing California license plate 6EYH898 and park in front of Iribe-Laveaga's residence. RDO investigators then saw ALVARADO enter and exit Iribe-Laveaga's residence several times. ALVARADO was

also seen using his phone while outside the residence. Investigators checked law enforcement databases and DMV records confirmed that the registered owner of the silver Toyota Corolla is Meza Elvia Laveaga. Based on my training and experience, I know that drug traffickers will often drive vehicles registered to other persons, fictitious or otherwise, in an attempt to evade law enforcement in the furtherance of their criminal enterprise.

20. While Iribe-Laveaga met with the UC agents at the Zendeja's Mexican Grill, RDO investigators did not observe ALVARADO leave Iribe-Laveaga's residence.

**C.   Discovery of 21 Pounds of Suspected Methamphetamine**

21. On February 2, 2022, RDO investigators established surveillance on Iribe-Laveaga's residence at approximately 11:00 a.m. Investigators again saw the silver Toyota Corolla, bearing California license plate 6EYH898, parked in front of Iribe-Laveaga's residence. An RSO agent, acting in an undercover capacity, made a recorded phone call to Iribe-Laveaga to discuss the time and place to meet in order for the UC to receive approximately 30 kilograms of methamphetamine, as previously negotiated with Iribe-Laveaga. The UC agent agreed to meet at The Home Depot parking lot located at 6140 Hamner Avenue in Mira Loma, California 91752. At approximately 12:20 p.m., RDO investigators saw Iribe-Laveaga depart his residence in a white Audi A5. At the same time, RDO investigators observed ALVARADO exit the residence and depart in the silver Toyota Corolla.

6

ALVARADO did not carry anything with him from the residence to the car.

22. RDO investigators maintained surveillance on ALVARADO in the Toyota Corolla and observed him driving toward The Home Depot parking lot. RDO investigators lost visual contact with ALVARADO for approximately five minutes, after which investigators saw ALVARADO arrive and park in The Home Depot parking lot at approximately 12:30 p.m. Based on the five minutes between when investigators lost and regained sight of ALVARADO, it is likely that ALVARADO drove directly to The Home Depot parking lot without making any stops.

23. While ALVARADO was driving to The Home Depot parking lot, RDO investigators simultaneously maintained surveillance on Iribe-Laveaga in the white Audi A5. RDO investigators observed Iribe-Laveaga drive to a school parking lot where they saw a child enter the vehicle. RDO investigators observed Iribe-Laveaga drive directly from the school to The Home Depot parking lot where ALVARADO had parked some time before, arriving at approximately 12:40 p.m.

24. After Iribe-Laveaga arrived at The Home Depot parking lot, the UC agent spoke with Iribe-Laveaga on the phone. Iribe-Laveaga guided the UC agent over to ALVARADO's Toyota Corolla. While speaking to Iribe-Laveaga, the UC agent walked up to the driver side door of the Toyota Corolla, where ALVARADO was sitting with the window down. After the UC agent confirmed that this was the correct car with Iribe-Laveaga, they ended the

phone call. Investigators conducting surveillance of the parking lot saw the UC enter ALVARADO's Toyota Corolla.

25. The UC, wearing a concealed audio recording device, sat in the front passenger seat of ALVARADO's Toyota Corolla and pulled a black duffel bag from the back seat of the Corolla and placed it on his lap. The UC attempted to unzip the duffel bag, but the zipper became stuck. ALVARADO reached over and helped the UC agent fully unzip the duffel bag, revealing to both ALVARADO and the UC agent 21 individually wrapped bundles of suspected methamphetamine. The bundles were wrapped in a combination of plastic wrap and black tape.

26. Based on my training and experience, I know that methamphetamine is often packaged into individual bundles weighing approximately one pound each, and each bundle is wrapped tightly with plastic wrap, duct tape, or other adhesives.

27. The UC stated that inside the car, he counted the bundles of suspected methamphetamine out loud in front of ALVARADO and told him that everything "looked good." The UC then told ALVARADO that he would go get the money, to which ALVARADO asked if the UC agent was going to deliver all of the money to him specifically. At that point, the UC got out of the Corolla and investigators arrested ALVARADO and seized the suspected methamphetamine.

28. During a search of ALVARADO's person incident to his arrest, investigators found the SUBJECT DEVICES.

### D. Field Test of Suspected Methamphetamine

29. After ALVARADO's arrest, RSO investigators field tested the suspected methamphetamine that they recovered from the Toyota Corolla. The field tests positively indicated the presence of methamphetamine. The packages of methamphetamine weighed approximately 21 pounds.

### E. Iribe-Laveaga's Flight and Arrest

30. While ALVARADO was being placed under arrest, RDO investigators attempted to arrest Iribe-Laveaga in the white Audi A5, which was still in The Home Depot parking lot. As RDO investigators approached the Audi, however, Iribe-Laveaga drove erratically through the parking lot to evade the arresting agents. Iribe-Laveaga then sped toward a residential neighborhood in Ontario, California. Iribe-Laveaga eventually stopped the car and tried to flee on foot before RSO investigators arrested him and took him into custody.

### F. ALVARADO's Statements

31. According to the UC agent who met ALVARADO in the Corolla, ALVARADO stated that he was going to be paid $600 in exchange for successfully delivering the suspected methamphetamine to the UC agent. ALVARADO also admitted to the UC that he has completed drug deliveries for Iribe-Laveaga in the past.

32. After his arrest, ALVARADO spontaneously told investigators that the only reason he made these deliveries was to support his family.

33. Additionally, after his arrest, ALVARADO spontaneously asked investigators if they had caught the "other guy." I believe ALVARADO was asking whether investigators arrested Iribe-Laveaga.

34. Later in the day on February 2, 2022, RDO investigators interviewed ALVARADO at the Jurupa Valley Riverside Sheriff's Station located at 7477 Mission Boulevard, Jurupa Valley, California 92509. The interview was recorded and investigators advised ALVARADO of his *Miranda* rights. During the interview ALVARDO told agents the following:

 a. ALVARADO told agents his biographical information, to include his full name and date of birth.

 b. ALVARADO is not a United States citizen and was from Culiacan, Mexico, where he worked in the construction business. ALVARADO arrived in the United States legally on January 8, 2022, through a tourist visa.

 c. ALVARADO has known Iribe-Laveaga for several years. Iribe-Laveaga told ALVARADO to come to the United States to make more money. ALVARADO suspected that Iribe-Laveaga traffics drugs.

 d. On January 9, 2022, the day after ALVARADO arrived in the United States, Iribe-Laveaga directed him to deliver a parcel via United States Postal Service ("USPS"). ALVARADO later sent several parcels via USPS to recipients in North Carolina, which Iribe-Laveaga explained were presents.

 e. ALVARADO knew drugs were present in Iribe-Laveaga's residence at 7107 Vernazza Place, Eastvale,

California.  There were also two firearms in Iribe-Laveaga's residence at 7107 Vernazza Place.  ALVARADO did not identify where the firearms were within the residence.

      f.  On the morning of February 2, 2022, he saw the black duffel bag containing the 21 pounds of suspected methamphetamine in the kitchen of Iribe-Laveaga's residence at 7107 Vernazza Place.  He knew that the bag contained drugs and that Iribe-Laveaga was going to pay him $600 to deliver the black duffel bag.

      g.  The delivery leading to his arrest on February 2, 2022, was the first time he had delivered methamphetamine.

    **G.  Identification of ALVARADO and Discovery of Ghost Gun**

    35.  On February 2, 2022, after ALVARADO's arrest, RDO investigators executed the search warrant (5:22-MJ-00061) at Iribe-Laveaga's residence.  In one of the bedrooms, investigators found several documents bearing ALVARADO's full name, matching the name given during his post-arrest interview and as written on a Mexican Voter Registration Card recovered during his arrest.

    36.  ALVARADO's bedroom contained documents bearing his name only.  No documents with Iribe-Laveaga's name or other names were discovered in ALVARADO's bedroom.  On ALVARADO's bed, underneath a pillow, RDO investigators found a Polymer80 Glock 9mm handgun with no serial number, with a magazine containing nine bullets.  These firearms are commonly referred to as "eighty percent" guns because they are purchased as a legally incomplete firearm, allowing the purchaser to later assemble a

fully functioning firearm from additional parts obtained through often-illegal means, often omitting or defacing the firearm's serial number. Based on my training and experience, this type of unregistered and unserialized firearm is commonly used by drug traffickers to circumvent the law and evade law enforcement detection in the furtherance of their criminal enterprise.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

37. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications,

sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38. As used herein, the term "digital device" includes the SUBJECT DEVICES.

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

14

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    41.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

      a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ALVARADO's thumb- and/or fingers on the

16

device(s); and (2) hold the device(s) in front of ALVARADO's face with his or her eyes voluntarily open to activate the facial-, iris-, and/or retina-recognition feature.

42. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

43. For all of the reasons described above, there is probable cause to believe that ALVARADO has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (possession with intent to distribute at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  3rd  day of
 February , 2022.

_____
HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE